# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

|  |  |
|---|---|
| In re<br><br>**MICHAEL G. DEWHURST,**<br><br>               **Debtor**<br>―――――――――――――――<br>**GERALD KNAPPIK,**<br><br>           **Plaintiff**<br><br>**v.**<br><br>**MICHAEL G. DEWHURST,**<br><br>            **Defendant** | **Chapter 7**<br>**Case No. 12-13317-FJB**<br><br><br><br><br><br>**Adversary Proceeding**<br>**No. 12-1313** |

## <u>MEMORANDUM OF DECISION</u>

By his complaint in this adversary proceeding, plaintiff and creditor Gerard Knappik ("Knappik") objects to the discharge of the chapter 7 debtor, Michael G. Dewhurst ("Dewhurst"), under 11 U.S.C. §§ 727(a)(3), (a)(4)(A), and (a)(5) and, in the alternative, seeks a determination under 11 U.S.C. § 523(a)(2)(A) that Dewhurst's debt to him is excepted from discharge.  After a two-day trial, the Court now makes the following findings and rulings and, on the basis thereof, will deny Dewhurst a discharge.

**PROCEDURAL HISTORY**

Dewhurst filed a petition for relief under chapter 7 of the Bankruptcy Code on April 18, 2012.  On November 13, 2012, Knappik timely filed the complaint commencing this adversary proceeding.  In it he asserts four counts.  The first is a request for a determination that Dewhurst's debt to him in the principal amount of $211,000 for monies due under a series of loan agreements is excepted from discharge under 11 U.S.C. § 523(a)(2)(A) as a debt for money or credit obtained by false representations.

The second is an objection to discharge under 11 U.S.C. § 727(a)(3) for Dewhurst's alleged failiure to keep or preserve recorded information from which his financial condition or business transactions might be ascertained—especially the disposition of $220,000 that Knappik loaned Dewhurst for use on a business venture.  The third, closely related in substance to the second, is an objection to discharge under 11 U.S.C. § 727(a)(5) for Dewhurst's alleged failure to explain satisfactorily his loss of assets—specifically, of the $220,000 that Knappik loaned him—and the deficiency of his assets to meet his liabilities.  And the fourth is an objection to discharge under 11 U.S.C. § 727(a)(4)(A) for knowingly and fraudulently making false oaths in connection with the case; in the complaint, Knappik bases this count on six alleged false oaths, but in his proposed findings and conclusions, he has reduced that number to two:  the omission of a receivable from his schedule of personal property, and the omission of a creditor, his uncle, from the schedule of unsecured creditors.  Dewhurst answered by denying the operative allegations of each count.

The matter was tried over two days.  Knappik offered the testimony of three witnesses—Knappik himself, Dewhurst, and Chitravanu Neogy—and Dewhurst, for his case, offered further testimony of his own.  After trial, Knappik filed proposed findings of fact and rulings of law, and Dewhurst filed a post-trial brief.

**FINDINGS OF FACT**

**a.      The Parties**

Knappik is the pastor of the First Baptist Church in Raynham, Massachusetts ("the Church") and, for supplemental income, the principal of a delivery company known as Package Hound Courier, Inc. ("Package Hound"), which he operates out of his home. Dewhurst runs a small computer repair business known as Global Computer Repair (GCR), a sole proprietorship. The parties' relationship began in the summer of 2008, when Knappik engaged GCR—which was essentially Dewhurst himself, GCR being a one-person enterprise—to perform work on the Church's computer system.  Later, Knappik also hired

GCR to perform similar work for Package Hound at Knappik's home.  Knappik was pleased with

Dewhurst's work on both jobs.  As a result of these two jobs, Knappik and Dewhurst developed a cordial

relationship.  They met occasionally for dinner and discussed, among other things, their respective

businesses and personal finances.

**b.**    **Dewhurst's Business Plans**

In the first half of 2009, Dewhurst was contemplating a new business venture, the commercial

development of a Facebook poker-playing application (the "Project").  Dewhurst envisioned an

application that would enable multiple individuals to play poker together over the internet through

Facebook.  He believed that once up and running, the application would prove highly lucrative, with

income to be generated from advertising revenues and the sale of chips (play money for use in the on-

line game).  With a Florida attorney named Robert L. Goldberg ("Goldberg"), who handled the legal

work, Dewhurst created a Florida limited liability company known as GlobalStar LLC ("GlobalStar"), of

which Dewhurst and Goldberg were each fifty percent members, to develop the application and

maintain it as a business venture.

Dewhurst did not have the programming skills to develop this application on his own and

therefore needed to hire others to write the code and develop animation and graphics.  To that end,

over several weeks, he interviewed numerous software developers and settled on one known as Acadia

Edge Group, LLC ("AEG"), whose business was the development of software products for other

companies.  Its sole member and manager was Chitravanu Neogy; aside from Neogy, AEG had no

employees of its own and provided services to its clients largely through independent contractors.

Through Dewhurst, GlobalStar entered into a product development agreement with AEG on July 16,

2009 ("the PDA").  The PDA described the services to be rendered as the design, development, testing,

and delivery of a Facebook poker application per requirements that Dewhurst had specified.  The PDA

indicated that these services were to be billed at specified rates per "man month," and it included an

estimate that nine man months (three "resources" for three months), at $3,200 per month, would be required to complete the contract services, for an estimated total cost of $28,200.  Dewhurst knew at this time that the PDA would not be GlobalStar's only cost in developing and launching its application.  GlobalStar would also need the services of graphic designers, animators, and developers of a "shopping cart" module, who would be separately hired and would work with AEG.  GlobalStar would have others costs, too, including a market researcher and marketing and advertising costs.  Still, he testified that he envisioned that the application would "launch," be up and running—albeit not with all the bells and whistles it might ever have—by December of that year, and that the total cost of getting it there would be approximately $29,000.

c.    **The Loans**

Dewhurst informed Knappik of his business plan and impressed upon him that his Facebook poker application "was going to be something very, very big."  Dewhurst told Knappik that he could make more money by lending Dewhurst money for this project than by letting his money sit in a bank account.  Knappik expressed a great deal of interest in the project and a willingness to lend Dewhurst money to help it along.  Dewhurst asked Knappik to loan him $50,000 to be used specifically for the Project.  On July 16, 2009, the same day as GlobalStar entered into the PDA with AEG, Dewhurst and Knappik signed a loan agreement memorializing a loan of $50,000 from Knappik to Dewhurst himself (not to GlobalStar) for a term of one year at 11 percent interest per annum (the "7/16/09 Agreement").  Pursuant to this agreement, which Dewhurst himself drafted without aid of an attorney, Knappik advanced $50,000 to Dewhurst personally by check.  Dewhurst had told Knappik that this loan would be used only on the Facebook poker application project ("the Project"), and he expressly made this a term of the 7/16/09 Agreement:  "The sole purpose of this loan agreement is to provide funds on a personal level for the startup of said business project, in conjunction with borrower's personal funds, not limited to startup costs, operating expenses, advertisement costs."

In the fall of 2009, Dewhurst asked Knappik for a loan of another $25,000 for the Project, and Knappik did loan Dewhurst $25,000 on January 19, 2010; that same day, the parties memorialized this loan by signing a loan agreement with the same terms as the first loan.

In the spring of 2010, Dewhurst told Knappik that he needed more money.  On May 28, 2010, Knappik loaned another $25,000 to Dewhurst personally by check, and both parties signed a loan agreement with the same terms as the prior loan agreements.

Dewhurst next conversed with Knappik about the status of the Project in August 2010.  He told Knappik that the beta testing of the application was running into problems, that there were tremendous cost overruns, and, again, that he needed more money.  Knappik made another loan to Dewhurst on August 18, 2010. This time, he loaned Dewhurst personally $40,000, which he advanced by check, and the parties signed a loan agreement with the same terms as the prior loan agreements.

In October 2010, Dewhurst approached Knappik with another loan request, this time for $25,000.  Knappik made the loan by a bank treasurer's check for that amount, and the parties signed a loan agreement with the same terms as the prior loan agreements.

Only a month later, Dewhurst came to Knappik with yet another loan request, for $25,000. Knappik was unable to provide a loan for that amount, but, on December 3, 2010, he did loan Dewhurst personally $11,000 by a bank treasurer's check.  Although the parties verbally agreed that this advance was made on the same terms as the prior loan agreements, the writing that Dewhurst prepared to memorialize this agreement was never signed.  Despite the lack of a signed writing, neither party denies that they had an agreement, disputes the terms, or disputes that Knappik in fact advanced $11,000 in accordance with the agreement.

After the holidays in January 2011, Dewhurst again came to Knappik for more money, another $25,000.  Knappik could not immediately give him a loan in this amount because his own funds were

low.  Instead, Knappik loaned Dewhurst $15,000 on January 14, 2011 and a further $9,000 on February 4, 2011.

Knappik made four additional loans after the February 4, 2011 loan. These loans differed from the previous loans because Dewhurst never asked for specific amounts.  Instead, he appeared to Knappik to be in a frenzied state, asking for funds but stating, "Whatever you can give me will be fine." Pursuant to these requests, Knappik loaned Dewhurst $6,500 on February 18, 2011, $6,500 on March 4, 2011, $4,500 on April 18, 2011, and $2,500 on May 7, 2011.

In total, Knappik made twelve loans to Dewhurst, for total advances of $220,000.  Dewhurst made only one payment, of $9,000, to Knappik on the loan debt.

### d.        Representations

Knappik alleges that, in connection with each loan he made, Dewhurst made representations to Knappik that were false and known to Dewhurst to be false, that Dewhurst made these representations with intent to deceive and to induce reliance, and that he (Knappik) justifiably relied on the representations to his detriment by making the loans.

#### 1.        Use of the Funds

The first alleged misrepresentation, one that Knappik contends Dewhurst made in connection with all twelve loans, is that Dewhurst intended to use the loan proceeds to advance the Project.  It is undisputed that Knappik made each loan to Dewhurst on the basis of a representation by Dewhurst to Knappik that the loan proceeds would be used only for the Project.  It appears to be undisputed, and in any event I find, that Dewhurst made these representations to induce Knappik to make the loans and that Knappik did rely on these representations in making each loan, to his detriment.  I further find that in each instance, Knappik had no reason to disbelieve these representations, that his reliance on the representation was justifiable.

Dewhurst denies that the representations were false.  He contends that, consistent with his representations of intent, he did in fact use all the funds for the Project and none of them for personal or other uses.   Knappik bears the burden of proving falsity.  The alleged representations are of intent, and the question presented is whether, when Dewhurst represented that the funds would be used solely for the Project, he actually intended to honor that promise and to use the funds accordingly.  The representation in question was made twelve times, and its veracity must be determined with respect to each iteration.

I find that Knappik has not carried his burden of proving that the representation was false when Dewhurst made it conjunction with the first three loans, made on July 16, 2009 and January 19 and May 28, 2010.  When Dewhurst requested these loans and represented that he intended to use them exclusively on the Project, it is plausible that he intended to use the advances of $50,000, $25,000, and $25,000 solely for purposes of the Project.  There is reason to doubt this and conclude otherwise, but not a preponderance.

With respect to this representation as Dewhurst made it in conjunction with each of the subsequent nine loans, however, the evidence preponderates in favor of a finding that the representation was false.  By the time of the fourth loan in August 2010, AEG's work on the PDA had been complete for two months, albeit not with a satisfactory product, and GlobalStar had fully paid AEG for its work.  Dewhurst continued to explore the possibility of AEG's doing further work on the Project, but no agreement for further work was ever reached by the date of this loan (and would not be reached until the summer of 2011).  In requesting the August 2010 and later loans, Dewhurst did not inform Knappik that work on the Project had come to a standstill.  Moreover, by August 2010, Dewhurst had already received loans of $100,000 from Knappik and additional investment (in the form of the wire transfers into the GlobalStar account) from Goldberg of $27,188, for total Project investment of

7

$127,188,[1] but Dewhurst is unable to demonstrate expenditures on the Project of more than half that

sum.  By August 2010, when the fourth loan was requested, Dewhurst should therefore have had some

$60,000 in reserve (if not more).  That he did not is evidence that he was already expending Project

monies, including the proceeds of Knappik's loans, on non-Project purposes.  For these reasons, I find

that as to the last $120,000 of loans, Dewhurst's representations to Knappik that the funds would be

used exclusively for the Project were false representations of his intent.  I further find that he made this

representation in each instance with knowledge of its falsity and intent to deceive and induce reliance.

### 2.      Other Representations

Knappik alleges that Dewhurst made other misrepresentations to induce him to make various of

the loans.  As to each of these, the evidence for the false statement consists solely of Knappik's

testimony, based on his recollection, and Dewhurst denies that he made each representation in

question.  While I find Knappik credible and Dewhurst much less so, I find Knappik's testimony as to each

of these alleged misrepresentations—which I need not enumerate here—to be too lacking in detail to

amount to a preponderance of the evidence.  I have little sense in each instance of the precise words

used and of the date and circumstances of each representation.  While it is not clear that Dewhurst did

not make some or all of the representations in question, the burden is on Knappik, and his proof does

not rise to a preponderance.

### e.      Work on the Project

The lead developer on the Project was AEG.  Its principal, Chitravanu Neogy, testified at trial

regarding the progress of AEG's work on the Project, on negotiations for extensions to the PDA, and on

GlobalStar's payments to AEG for its work on the PDA and the Project.  Dewhurst also testified on these

---

[1] Dewhurst testified that he also invested $45,000 of his own money into the Project, but there is no evidence as to when (if ever) or how he invested this money.  His uncle also loaned him another $39,000 to use on the Project, but only in April of 2011.

matters.  Their testimony differed markedly at points.  Where they differ, I find Neogy's testimony

credible and Dewhurst's not.

 Neogy and Dewhurst agree that the initial agreement between GlobalStar and AEG was the

PDA, entered into on July 16, 2009.  In Neogy's words:  "if we complete the contract . . . there will be a

Facebook poker application that would be accessible to users of Facebook, and it will be running on a

production server so people can actually play the game."  The PDA was based on estimates that this

would be accomplished in approximately three months, for a total cost, given specified rates, of

$28,800.  Work on the Project commenced in August 2009 was not completed in the three months or

the budgeted number of man months, so on or around December 1, 2009, Dewhurst and Neogy

discussed a proposed contractual extension to the PDA that was embodied in a document entitled "AEG

Poker Project Extension" and dated December 1, 2009 (the "First Proposed Extension").  The First

Proposed Extension was never signed and never agreed on, but AEG nonetheless did perform some of

the work it called for and other work it did not, and GlobalStar made payments for this work in amounts

the parties had orally agreed upon.

On or around February 1, 2010, Neogy and Dewhurst discussed a second proposed extension of

the PDA, as embodied in a document entitled (again) "AEG Poker Project Extension" and dated February

1, 2010 (the "Second Proposed Extension").  The Second Proposed Extension was never signed and

never agreed on.  Again, however, AEG did perform some of the work it called for, and GlobalStar paid

for this work in amounts the parties had orally agreed upon, but much less than the $18,000 cost

specified in the Second Proposed Extension.

On or around March 16, 2010, Neogy and Dewhurst discussed a third proposed extension of the

PDA, as embodied in a document entitled "AEG Poker Pre Launch Agreement" and dated March 16,

2010 (the "Third Proposed Extension").  The Third Proposed Extension was never signed and never

agreed on.  The services it contemplated were not performed at all, and no payment was made on it.

On or around June 1, 2010, Neogy and Dewhurst discussed a proposal for a tech support agreement—to provide monitoring and assistance services for the Facebook poker application as it operated and was used—entitled "AEG Poker Tech Support Agreement" and dated June 1, 2010 (the "Proposed Tech Support Agreement").  The Proposed Tech Support Agreement was never signed and never agreed on.  The services it contemplated were not performed at all, and no payment was made on it.

Also on or around June 1, 2010, Neogy and Dewhurst discussed a fourth proposed extension of the PDA, as embodied in a document entitled (again) "AEG Poker Pre Launch Agreement" and dated June 1, 2010 (the "Fourth Proposed Extension").  The Fourth Proposed Extension was never signed and never agreed on.  The services it contemplated were not performed at all, and no payment was made on it.

As to the four Proposed Extensions and the Proposed Tech Support Agreement, Dewhurst testified that, though unsigned, each had nonetheless been agreed upon between himself for GlobalStar and Neogy for AEG, and that GlobalStar had paid AEG for each.  Dewhurst's testimony is contradicted by Neogy's and uncorroborated.  Most pointedly, he lacks evidence of the payments he contends GlobalStar made on these agreements.  I therefore reject his testimony and credit Neogy's.

As Neogy testified, GlobalStar made a total of nine payments to AEG for its services on the PDA and for the additional work that AEG performed by oral agreement, in full payment of its obligations under the PDA and oral amendments.  These payments totaled $38,300 and were made as follows.

| Date | Amount |
|------|--------|
| 8/16/09 | $4,800 |
| 9/22/09 | $8,000 |
| 11/9/09 | $8,000 |
| 12/8/09 | $4,000 |
| 1/6/10 | $2,000 |
| 1/10/10 | $2,000 |
| 2/2/10 | $3,000 |
| 3/23/10 | $3,000 |

| | |
|---|---|
| 5/24/10 | $3,500 |
| **TOTAL** | **$38,300** |

The first of these payments was made by a bank check from Citizens Bank.  The remaining eight were made by checks drawn on the GlobalStar Account, an account at Citizens Bank.  Dewhurst testified that GlobalStar had made an additional fourteen payments to AEG:  eleven, totaling $50,340, through Western Union; one for $12,000 in the form of cash; and two totaling $960 whose form is unclear.  Neogy testified that AEG received none of these alleged payments and had performed no services for which the alleged payments were owing.  Dewhurst could offer no corroboration for these alleged payments.  He conceded that when he makes a payment through Western Union, Western Union gives him a receipt for the transaction.  He could adduce no such receipts for the eleven alleged transfers to AEG through Western Union.  I find that none of these alleged payments was ever made, either by Dewhurst or by GlobalStar.

Neogy further testified, and I find, that AEG completed its work and delivered its product—a functional poker game, running on a server and accessible to the public through Facebook—to GlobalStar in May, or perhaps early June, of 2010.  In Neogy's opinion, which Dewhurst shared, it still required extensive testing and refinement on the basis of the feedback that testing would have produced.  This testing and refinement were never done because AEG and GlobalStar could not agree on terms.  From June 2010 to July 2011, AEG did no further active development, testing, or support of the product, and certainly no services that GlobalStar paid for.  Dewhurst continued to explore ways to move the Project forward, but all his thinking and exploration resulted in no activity by AEG for some 14 months.  During at least some of these months, the poker game was functional.  I have no evidence as to whether GlobalStar was deriving income from it during this time.

In July 2011, Dewhurst notified Neogy that he was ready to move ahead with further development, and to that end they met again and agreed to restart the Project.  Neogy had asked for a

deposit in the form of a check, but Dewhurst gave him a cash deposit of $1,000.  AEG did begin working

again on the project.  In doing so, it found that the original software, the application that AEG had

developed for GlobalStar, had been deleted and lost—Dewhurst had not downloaded a copy, GlobalStar

failed to pay the hosting fee for the server on which it resided, and the application had been simply shut

down, deleted from the host server, and thus lost.  AEG therefore expended approximately six weeks on

reconstruction efforts, but Dewhurst then abruptly informed Neogy that he was shutting down the

Project.  Neogy elected to return the $1,000 deposit to Dewhurst—he did this by check, wanting to keep

a record for AEG.  And this apparently marked the end of the Project and of the relationship between

GlobalStar and AEG.  AEG provided no further services; GlobalStar made no further payment and owed

none.

**f.      Dewhurst's Record Keeping and Accounting for Use of Knappik's Funds**

When Dewhurst received the $50,000 that Knappik advanced on the first loan, the loan of July

16, 2009, he initially deposited Knappik's $50,000 check into the checking account of GCR, his sole

proprietorship. GlobalStar did not yet have a bank account of its own.  Then, as soon as the check

cleared, he withdrew the entire sum from the GCR account in the form of cash and kept the cash at his

home.  Dewhurst did the same with the proceeds of each loan that Knappik made to him:  he converted

each to cash and kept the proceeds at home.  He now maintains that he used the entire $220,000 on the

Project.

Whatever he did with the money, he has adduced no contemporaneous records of his

disbursements and uses of this cash, no cash journal, ledger, or disbursement slips of any kind.  He

testified that he generated and retained disbursement slips as to at least some of the disbursements,

and that he gave copies of these—he said "copies," not originals—to Knappik's counsel during discovery

in this adversary proceeding, but he adduced no such slips at trial.  I disbelieve his testimony that he

adduced disbursement slips during discovery and find that he generated no records of his cash

disbursements at all and that, if he generated any disbursement slips, he has not retained or preserved them.  He has adduced records of payments that he says he funded with this cash, but he can offer no evidence, other than his present testimony, that the payments in question were funded with this cash.

Dewhurst was asked at trial why he cashed the loan proceeds and had not simply deposited them in a checking account for disbursement as needed.  It was not because GlobalStar did not have a checking account.  Dewhurst opened a checking account at Citizens Bank for GlobalStar (the "GlobalStar Account") on July 30, 2009, with a deposit of only $5,000.  He then wrote a check on this account to AEG in the amount of $4,800, GlobalStar's first payment on the PDA.  This was consistent with his practice over the succeeding twelve months (the period for which he has adduced records of the GlobalStar Account):  he deposited cash into the GlobalStar Account only when and to the extent that he needed to fund payments from that account.  Dewhurst acknowledged that his practice of keeping his monies in the form of cash was unusual, but he maintained that he needed to operate this way to avoid payment delays, not only to AEG but especially to other service providers, including in India and Australia.  Some of these payments he made by check from the GlobalStar Account, but others he made through intermediaries such as PayPal, Western Union, and Xoom—and for these, he contends, cash was far more expeditious.  I disbelieve this testimony because the GlobalStar Account statements show that he used debits against that account on at least a dozen occasions to fund payments through PayPal and once through Xoom.  He may have needed cash on a few occasions—it is not clear that he could not just as expeditiously have funded these by debits from the GlobalStar Account—but these were infrequent and the amounts small.

During discovery in this adversary proceeding, Knappik served interrogatories on Dewhurst.  These required that he "identify the date, payee and amount of each payment made by the Debtor and GlobalStar from funds loaned by the Plaintiff to the Debtor, as well as the source of such payment (i.e. the bank account, or if applicable, "cash" or "wire transfer").  Dewhurst responded:  "I am in the process

13

of obtaining additional documentation of such payments and will supplement this answer as soon as

possible.  For present purposes, I am attaching a spreadsheet of such payments, created based on bank

records currently in my possession."  The attached spreadsheet (the "Worksheet") listed some forty-

four alleged payments, made between August 16, 2009 and January 4, 2011, and totaling $110,070.58.

Dewhurst never supplemented this answer or the Worksheet.  At trial Dewhurst introduced evidence of

further payments totaling only $1,580.[2]  The Worksheet therefore represents almost his entire

accounting, such as it is.  Therefore, even if the Worksheet's list of payments could be accepted at face

value, it would show that Dewhurst is able to account for disposition of at most approximately $112,000

of the $220,000 that Knappik loaned him.

For several reasons, the Worksheet cannot be taken at face value.  First, of the twenty-three

payments that the list indicates were made to AEG, I find that fourteen, totaling $62,340, were never

made.  Nine of the alleged payments, totaling $38,300, were made by checks issued from the GlobalStar

Account; these nine are corroborated by Neogy's testimony and the monthly bank statements for the

GlobalStar Account.  But Neogy denied, credibly, that the remaining fourteen were ever made.  He also

credibly denied even that work was done for which any such payment was due.  Eleven of these

payments, totaling $50,340, were allegedly made through Western Union; and three, totaling $12,960,

including a single payment for $12,000, were allegedly made directly in cash.  Dewhurst could adduce no

documentation or other evidence, not even receipts from Western Union, that he had made any of

these.  He also subpoenaed his payment records from Western Union, but the records that Western

Union produced showed no payments to AEG.  At trial, Dewhurst suggested that some of these

---

[2] Aside from the payments set forth on the Worksheet, the only other documentary evidence of any Project-related expenses produced by Dewhurst is contained in subpoenaed reports evidencing payments made through Western Union and a PayPal account. Dewhurst testified that only three of the Western Union payments, totaling $480.00, were related to the Project, but he provided no supporting evidence that these payments were related to the Project.  At most, $480.00 of the Western Union payments related to the Project. The subpoenaed records from PayPal reflect only $1,100 in payments that were not accounted for in the Worksheet.  There is no documentary evidence that any of the funds used to make the Western Union or PayPal payments were derived from funds Knappik loaned to Dewhurst.

payments were payments that, at Neogy's request, he had made directly to subcontractors of AEG.

Neogy credibly denied that he authorized or asked Dewhurst to pay his subcontractors directly; Neogy

pointed out, correctly, that this would have been a violation of an express term of the PDA.  Dewhurst

could not even identify the subcontractors whom he contends were his payees.  And, in each instance,

Dewhurst himself had identified AEG as the payee on the Worksheet.  Dewhurst's testimony is not

credible.  Therefore, of the $110,000 in payments accounted for in the Worksheet, fourteen, totaling

$62,340, must be stricken as fictitious.

Second, at least twenty-eight of the remaining payments, totaling $45,406.28, were made

through the GlobalStar Account.  The records of the GlobalStar Account show that, during the relevant

period, it was funded with deposits totaling $58,952.77, of which some $27,188 were monies that

Goldberg had deposited by wire transfers.  Dewhurst contends that Goldberg owed him money and that

these deposits by Goldberg were in essence repayments to Dewhurst of Goldberg's debt to him.  Be that

as it may, Dewhurst concedes that the monies deposited by Goldberg were not monies that Knappik had

advanced to Dewhurst.  Therefore, even if the remaining deposits were funded entirely with the

proceeds of Knappik's loan, the twenty-eight payments totaling $45,406.28 can account for no more

than $31,764.77 of those proceeds.

Third, consistent with my finding above that there is no documentary record of Dewhurst's

disbursement of any portion of Knappik's loan proceeds after Dewhurst converted them to cash, there is

no documentary proof that even the remaining $31,764.77 of deposits into the GlobalStar Account—or

indeed any of the Worksheet disbursements—were funded with proceeds of Knappik's loans.  On this I

have only Dewhurst's word and, in view of the misrepresentations in the list, cannot give it credence.

Dewhurst contends that he had invested some $45,000 of his own in the Project—it is possible that the

deposits were funded with monies other than Knappik's.

In summary, Dewhurst's accounting is deficient on its face by half, replete with misrepresentations and overstatements, and even with the benefit of the doubt, which I am not inclined to give him, can plausibly account for the disposition of less than one-fifth of Knappik's loan advances. He nonetheless maintains that he expended the entire $220,000 of Knappik's loan proceeds on the Project—mostly in payments he cannot remember to payees he cannot identify—and would have the Court so find, solely on his say so.  I do not so find.

### g.    Omissions from Schedules

In his bankruptcy case, Dewhurst filed schedules of his personal property and of unsecured creditors.  He concedes that he filed these under penalty of perjury.

### i.    Omission of Loan Receivable

At the time of his bankruptcy filing, Dewhurst concedes, he had loaned some $4,500 to a friend and was entitled to repayment of this loan.  He was obligated to disclose this receivable on his schedule of personal property at item 16, for "accounts receivable," or item 18, for "other liquidated debts owed to debtor," but he did not list it in either place or indeed anywhere in his schedules or other filings in the bankruptcy case.  The omission rendered the schedule of personal property false in this respect.

At trial, Dewhurst testified that this receivable had been omitted because "at the time I wasn't aware that I actually had to.  It was just an error and I wasn't advised by my attorney at the time that it needed to be entered."  He did not elaborate on what advice, if any, his attorney had given him about this.  He did not explain how the alleged "error" had occurred, what it consisted of.  Had he not read or understood the schedule he was completing?  He did not offer testimony by the attorney who had represented him in filing the case and preparing the schedules.

Dewhurst further testified that at the §341 meeting of creditors in this case, the chapter 7 trustee asked him, "Do you foresee suing anybody in the future and coming into any money?" Dewhurst further testified:  "I answered truthfully at that point that, you know, I had loaned a friend of mine a

small portion of money a few years back and he hasn't -- he hadn't paid me back at the time." Dewhurst testified that Knappik's counsel was present when he gave this answer. Dewhurst testified that the trustee then advised his (Dewhurst's) counsel that the schedules should be amended to reflect this receivable, but that he never filed an amendment because his attorney believed it was unnecessary, the trustee having by then already filed a report of no distribution. Dewhurst offers no corroboration for his testimony as to what transpired at the meeting of creditors, but Knappik does not dispute it.

Notwithstanding his honest answer at the meeting of creditors, Dewhurst has offered no real explanation for the omission of this receivable. In making it, he may have been motivated by a desire to protect his friend, the account debtor, or by a desire to keep the receivable from the trustee. I further note that this omission is accompanied by another concerning his uncle's loan. Finding no explanation or excuse for this admitted falsehood, I find by a preponderance that Dewhurst made it both knowingly and fraudulently.

### ii.    Omission of Loan Payable

In 2011, Dewhurst's uncle, Ronald Dewhurst, loaned him $39,000 for use on the Project. Dewhurst concedes that at the time of his bankruptcy filing, he remained indebted to his uncle for this loan. He was obligated to list this loan debt in the schedule of creditors holding unsecured nonpriority claims that he filed in his bankruptcy case, but he did not disclose it there. By virtue of this omission, the schedule of creditors holding unsecured nonpriority claims was false. Dewhurst testified at trial that this omission was not intentional, but he offered no explanation for how it came to be. Finding no explanation or excuse for this admitted falsehood concerning an insider, I find by a preponderance that Dewhurst made it both knowingly and fraudulently.

**JURISDICTION**

The matters before the court are objections to discharge under 11 U.S.C. § 727(a) and a proceeding to determine the dischargeability of a debt under 11 U.S.C. § 523(a).  They arise under the Bankruptcy Code and in a bankruptcy case and therefore fall within the jurisdiction given the district court in 28 U.S.C. §1334(b) and, by a standing order of reference, referred to the bankruptcy court pursuant to 28 U.S.C. §157(a).  They are core proceedings within the meaning of 28 U.S.C. §157(b)(1) and (b)(2)(I) and (J) (core proceedings include objections to discharge and determinations of the dischargeability of particular debts). The bankruptcy court accordingly has authority to enter final judgment on them.

**DISCUSSION**

**Count I: § 523(a)(2)(A)**

Section 523(a)(2)(A) states:

> (a)  A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
>
> > (2) for money, property, services, or an extention, renewal, or refinancing of credit, to the extent obtained by—
> >
> > > (A)  false pretenses, a false representation, or actual fraud. . .

11 U.S.C. § 523(a)(2)(A). Knappik invokes all three parts of this section, alleging "false pretenses," "false representation," and "actual fraud," but in substance he has alleged only false representations. Knappik alleges eight separate misrepresentations that could form the basis for determination of nondischargeability: (i) Dewhurst falsely represented to Knappik that his father had advanced $50,000 for the Project and that his uncle was advancing $50,000 for the Project; (ii) Dewhurst falsely represented to Knappik that Dewhurst invested $250,000 in the Project, that Dewhurst's business partner, Robert Goldberg, had invested $500,000 in the Project, that Dewhurst had discussions with the Michael Dell Foundation about investing in the Project, and that Dewhurst owned the house in which he

lived; (iii) Dewhurst falsely represented to Knappik that investors were prepared to invest $7.2 million in

the Project and that there was ongoing beta testing on the Project; (iv) Dewhurst falsely represented

that there was ongoing work on the Project and accompanied cost overruns and beta testing problems,

and that Dewhurst had money in a 401k plan and IRAs to use to repay Knappik if there were problems

repaying the loans; (v) Dewhurst falsely represented to Knappik that funds were required to make

progress on the Project and that he had an expectation of reimbursement; (vi) Dewhurst falsely

represented to Knappik that he required additional funds for the Project in November or early

December of 2010; (vii) Dewhurst falsely represented to Knappik that there was ongoing work on the

Project, including work necessary to resolve problems with a shopping cart feature; and (viii) Dewhurst

falsely represented to Knappik that he needed additional funds to assist in paying ongoing development

expenses for the Project prior to the loans dated February 18, 2011, March 4, 2011, April 18, 2011, and

May 7, 2011.

A party seeking a determination of nondischargeability bears the burden of establishing by a

preponderance of the evidence that a particular debt falls within § 523(a)(2)(A) and therefore should be

excepted from discharge. *Grogan v. Gamer*, 498 U.S. 279, 291 (1995). If plaintiff fails to establish any

one of the necessary elements of § 523(a)(2)(A), then the court should reject the plaintiff's claims.

*Palmacci v. Umpierrez*, 121 F.3d 781, 787-88 (1st Cir. 1997).

To establish that a debt is nondischargeable under § 523(a)(2)(A) due to a false representation,

the plaintiff must prove each of the following elements:

(1)   the debtor made a false representation either knowingly or with reckless disregard for the

truth;

(2)   the debtor intended to deceive;

(3)   the debtor intended to induce the creditor to rely upon the false statement;

(4)   the creditor actually relied upon the misrepresentation;

(5)  the creditor's reliance was justifiable; and

(6)  the reliance upon the false statement caused damage (pecuniary loss).

*McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001); *Palmacci*, 121 F.3d at 786.  Mere

negligence is insufficient to prove actual fraud. *Palmacci*, 121 F.3d at 788. Intent can rarely be proven by

direct evidence; therefore, in attempting to discern it, the court should consider the totality of the

circumstances. *Palmacci*, 121 F.3d at 790.

In the findings of fact above, I have found that Knappik has established by a preponderance of

the evidence that each of the six enumerated requirements was satisfied with respect to the nine of the

twelve loan advances, totaling $120,000.  As to each, Dewhurst obtained the advance on the basis of a

false representation of his intent with respect to the monies being advanced, that they would be used

solely for the Project.  Therefore, the resulting debt for the principal amount of $120,000 and all interest

and costs assessed on that portion of the state judgment debt are excepted from any discharge that

may enter in this case.

In the findings of fact above, I have also found that, with respect to every other representation

on which Knappik is proceeding under § 523(a)(2)(A), Knappik has not carried his burden of proof as to

one or more of the enumerated requirements.  As to these representations, judgment must enter for

Dewhurst.  The exception from discharge shall accordingly be limited to the portion of the judgment

debt identified in the preceding paragraph.

**Count II: § 727(a)(3)**

Section 727(a)(3) states:

(a)  The court shall grant the debtor a discharge, unless—

(3) the debtor has concealed, destroyed, mutilated, falsified, or
failed to keep or preserve any recorded information, including
books, documents, records, and papers, from which the
debtor's financial condition or business transactions might be

ascertained, unless such act or failure to act was justified under
all of the circumstances of the case.

11 U.S.C. § 727(a)(3). The initial burden is on the party objecting to discharge to prove two things: (i)

that the debtor "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded

information;" and (ii) that the recorded information was information "from which the debtor's financial

condition or business transactions might be ascertained." *Lassman v. Keefe (In re Keefe)*, 380 B.R. 116,

120 (Bankr. D. Mass. 2007). The plaintiff need not establish specific intent of any kind. *Id.* If the party

objecting to discharge proves these two requirements, the burden then shifts to the debtor to prove

that "such act or failure to act was justified under all of the circumstances of the case." *Id.*; *Campana v.

Pilavis (In re Pilavis)*, 244 B.R. 173, 176 (B.A.P. 1st Cir. 2000) (debtor must come forward with

justification).

Subsection (a)(3) lists six possible predicate acts. Knappik relies on two of these: failure to keep

recorded information and failure to preserve recorded information. A "failure to preserve" recorded

information applies where a debtor loses—by whatever means, such as misplacement, theft, fire, water

damage, etc.—or discards existing recorded information; it presumes that recorded information once

existed. The Debtor suggests, without support or argument, that failure to keep is the same as failure to

preserve. I reject this construction. Failure to keep is a separate basis. Here, "keep" does not mean to

hold or preserve; if it did, the statute would not have to separately list failure to preserve as a basis. As

a rule of statutory interpretation, I must assume that the latter phrase was not mere surplusage. "[T]o

keep . . . recorded information" within the meaning of subsection (a)(3) is to generate the record in the

first instance, to record information. *Keefe*, 380 B.R. at 120 ("keep" in § 727(a)(3) means generate, not

retain); *Black's Law Dictionary* 868-69 (6th ed. 1990) ("keep" means "to maintain continuously and

methodically for the purposes of a record; as to 'keep' books"; and "keeping books" means "preserving

an intelligent record of a merchant's or tradesman's affairs with such reasonable accuracy and care as

may properly be expected from a person in that business"); and *American Heritage Dictionary, Second*

*College Ed.*, p. 698 (Houghton Mifflin Co. 1985) ("keep" means, among many other things, "to maintain

records in: *keep a yearly diary*," and "to enter data in a book: *keep financial records*").  This is consistent

with the purpose of subsection (a)(3), which is to require complete disclosure as a condition of receiving

a discharge; it is a matter not simply of adducing such records as may have existed but also of a debtor's

being able to present an accurate and complete account of his or her financial affairs.  *Razzaboni v.*

*Schifano (In re Schifano)*, 378 F.3d 60, 68 (1st Cir. 2004) ("[w]hile a debtor may justify his failure to keep

records in some cases, a discharge may be granted only if the debtor presents an accurate and complete

account of his financial affairs" (internal quotation and citation omitted)).

Knappik alleges that Dewhurst both failed to keep or generate records in the first instance and

failed to preserve certain records that he once had.  Knappik has carried his burden of proof as to both

charges.  Knappik converted all $220,000 of the loan advances to cash and claims to have expended the

entire sum on the Project.  If he did expend the entire sum, he has failed to account for in excess of four-

fifths of the expenditures.  He has no records of his use of any of the cash.  He has adduced some

records—mostly the monthly bank statement of the GlobalStar Account—that evidence payments on

the project totaling approximately $34,000, leaving some $186,000 unaccounted for; but even as to the

$34,000, he cannot show that the funding for these payments—whether from the GlobalStar Account,

PayPal, or Western Union—originated in Knappik's loan advances.  Perhaps he has not in fact expended

the loan proceeds.  In that event, he would be obligated to account for a considerable stash of cash, but

he has not done so:  in the schedule of personal property that he filed under oath in his bankruptcy case,

he represented that his cash on hand totaled $10.00 and that he had no funds in any checking, savings,

or other financial account.  I conclude that he has failed to keep and/or preserve recorded information

from which his financial condition or business transactions might be ascertained.

This conclusion shifts to Dewhurst the burden of showing that such act or failure to act was

justified under all of the circumstances of the case.  He has made no such showing and, in his post-trial

brief, does not even address the issue.  Dewhurst's failure to keep and preserve adequate records

makes it impossible to reconstruct an accurate and complete account of his financial affairs and business

transactions.  Even if he had a legitimate reason for keeping the loan proceeds in the form of cash, he

has offered no justification for his failure to keep records of his disposition of the cash—a large sum of

money received for a special purpose, on the express assurance that it would be used exclusively for

that purpose.  He has not established that his failure to keep or preserve records of its disposition was

justified.  Knappik's objection to Dewhurst's discharge under § 727(a)(3) must be sustained.

### Count III: § 727(a)(5)

Section 727(a)(5) states: "The court shall grant the debtor a discharge, unless . . . (5) the debtor

has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any

loss or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). The Bankruptcy

Appellate Panel has summarized the burdens:

> The plaintiff has the initial burden of identifying the assets in question
> by appropriate allegations in the complaint and showing that the debtor
> at one time had the assets but they are no longer available for the
> debtor's creditors. . . .   Once the creditor has introduced some evidence
> of the disappearance of substantial assets, the burden shifts to the
> Debtor to explain satisfactorily the losses or deficiencies.

*Ehle v. Brien (In re Brien)*, 208 B.R. 255 (B.A.P. 1st Cir. 1999).  The plaintiff must identify with specificity

the loss or deficiency the debtor has failed to explain. *M&I Heat Transfer Products v. Gorchev (In re*

*Gorchev)*, 275 B.R. 154 (Bankr. D. Mass. 2002). The plaintiff must also show that the debtor has been

called upon to explain the loss in question, in the adversary proceeding itself if not before. Once called

upon to explain a demonstrated loss or deficiency of assets, it falls upon the debtor to provide a

satisfactory explanation.  *Aoki v. Atto Corp. (In re Aoki)*, 323 B.R. 803, 817 (B.A.P. 1st Cir. 2005) (citation

omitted).   The Bankruptcy Appellate Panel set forth the requirements of a satisfactory explanation:

> A debtor's explanation need not be comprehensive, but it must meet
> two criteria: First, it must be supported by at least some corroboration.

See, e.g., *Wortman v. Ridley (In re Ridley)*, 115 B.R. 731, 737 (Bankr. D. Mass. 1990) (undocumented explanations are not satisfactory for § 727(a)(5) purposes) (citing *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616 (11th Cir. 1984); *First Tex. Sav. Ass'n v. Reed (In re Reed)*, 700 F.2d 986 (5th Cir. 1983)). Second, the corroboration must be sufficient to eliminate the need for any speculation as to what happened to all of the assets. *Id*.

*Aoki*, 323 B.R. at 817.

Knappik has demonstrated and Dewhurst has admitted that he received loan proceeds from Knappik in the aggregate amount of $220,000, the funds that are the subject of this count.  Knappik made various attempts to procure an explanation for the dissipation of these funds throughout the bankruptcy case, particularly in this adversary proceeding, where Dewhurst was asked to explain his use of the loan proceeds.  Knappik has met his burden of calling upon the debtor for an explanation of the dissipation of particular assets.

Dewhurst contends that he fully expended the loan proceeds on the Project, but his testimony to this effect is largely uncorroborated and not credible.  Even when the evidence is viewed most generously in his favor, he might be deemed to have satisfactorily explained the loss or expenditure of only approximately $34,000, leaving entirely unexplained the loss of an additional $186,000.  This is hardly an instance, as Dewhurst suggests, of nitpicking or "tracing every penny."  Especially where this money was received for a business purpose on express representations and assurances that it would be used solely for the Project, Dewhurst's accounting and explanation are grossly deficient. Accordingly I sustain the objection to discharge under § 727(a)(5).

### Count IV: § 727(a)(4)(A)

Knappik argues that the court should deny Dewhurst a discharge because he has established by a preponderance of the evidence that Dewhurst made false oaths in the case by failing to disclose a loan

receivable in his schedule of assets and omitting a loan obligation in his schedule of liabilities.[3]  I recently

set forth the law on the application of § 727(a)(4)(A) in *Irish Bank Resolution Corporation Limited (In*

*Special Liquidation) v. Drumm (In re Drumm)*, 524 B.R. 329, 394-395 (Bankr. D. Mass. 2015) and now

incorporate that fuller explication here by reference.  In short, the plaintiff bears the burden of proving

by a preponderance of the evidence that (i) the debtor made an oath (ii) that was false and (iii) related

to a material fact in the case (iv) knowingly and (v) fraudulently. *Boroff v. Tully (In re Tully)*, 818 F. 2d

106, 110 (1st Cir. 1987); *Commonwealth of Massachusetts v. Bartel (In re Bartel)*, 2009 WL 2461727 at

*5 (Bankr. D. Mass. 2009).   And the reasons for denial of discharge "must be real and substantial, not

merely technical and conjectural." *Tully*, 818 F. 2d at 110.  Dewhurst concedes that each omission was a

false oath, but he denies that each was material, saying they were "trivial and immaterial," and that he

made them knowingly and fraudulently.

I have found that each omission was knowing and fraudulent. I now further find and conclude

that each was material.  "[T]he threshold to materiality is fairly low."  *Lussier v. Sullivan (In re Sullivan)*,

455 B.R. 829, 839 (B.A.P. 1st Cir. 2011).  "The subject matter of a false oath is material, and thus

sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or

concerns the discovery of assets, business dealings, or the existence and disposition of his property." *In*

*re Chalik*, 748 F.2d 616, 618 (11th Cir.1984), cited and relied upon in *Tully*, 818 F.2d at 111; *Matter of*

*Mascolo*, 505 F.2d 274, 277-78 (1st Cir.1974) ("materiality of the false oath will not depend upon

whether in fact the falsehood has been detrimental to the creditors").  Both omissions easily surmount

the bar.  One concerns the existence of a debt of $39,000 to an insider, with the consequence that the

creditor in question received no court-originated notice of the case, and the trustee and creditors were

---

[3] These two alleged misrepresentations were not plead as a basis for relief in the complaint.  However, the Plaintiff did identify them with particularity in his Joint Pretrial Memorandum as among the bases on which he was seeking denial of discharge under § 727(a)(4)(A), and they were tried without objection.  In his proposed findings and conclusions, Knappik seeks relief under § 727(a)(4)(A) on the basis of these representations (and these alone—and has thus effectively waived the demands in his complaint for relief on the basis of other representations).  In his post-trial brief, Dewhurst addresses these alleged misrepresentations on their merits and does not allege inadequate pleading or notice.

kept in the dark about an obligation to an insider.  The other concerns a receivable for some $4,500, not

petty cash.  Each of the five requirements is thus satisfied, and each omission therefore is cause to deny

Dewhurst a discharge.

**CONCLUSION**

For the reasons set forth above, Knappik's objections to discharge under § 727(a)(3), (a)(4)(A),

and (a)(5) are sustained.  Judgment shall enter denying him a discharge.  In addition, should the

foregoing judgment be reversed or vacated on appeal, I conclude that the judgment debt of Dewhurst to

Knappik is excepted from any discharge that may enter in this bankruptcy case to the extent of $120,000

plus all interest thereon and other charges assessed in the state court judgment.

Date:  March 20, 2015

_____
Frank J. Bailey
United States Bankruptcy Judge